**FRIENDS OF THE CLEARWATER; The Ecology Center, Inc.; The Alliance for the Wild Rockies; and Idaho Sporting Congress, Plaintiffs,**

**v.**

**Kathleen McALLISTER, in her official capacity as Deputy Regional Forester for Region One of the Forest Service; Bruce Bernhardt, in his official capacity as Supervisor of the Nez Perce National Forest; and United States Forest Service, an agency of the United States Department of Agriculture, Defendants.**

No. CV–02–106–M–DWM.

United States District Court, D. Montana, Missoula Division.

Aug. 23, 2002.

Elizabeth Mitchell, Western Environmental Law Center, ID, Ronni Flannery, Attorney at Law, Missoula, MT, for Plaintiffs.

Victoria L. Francis, Mark Steger Smith, Office of the U.S. Attorney Billings, MT, for Defendants.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction

A fire in August of 2000 burned about 16,000 acres in the White Bird Creek drainage on the Nez Perce National Forest in Idaho. The Forest Service released an Environmental Assessment on the Burnt Fork salvage project in August 2001. The EA included three alternatives: a no action alternative, one action alternative calling for logging about 3 mmbf and another action alternative calling for logging about 3.5 mmbf. On February 12, 2002 Nez Perce National Forest Supervisor Bruce Bernhardt chose a modified version of Alternative 2 that called for 3 mmbf of logging over about 3,340 acres.

Plaintiffs appealed Bernhardt's decision. Deputy Regional Forester Kathleen McAllister denied the appeal on May 16, 2002. After McAllister denied the appeal, the Forest Service advertised the sale for bid

on May 29, 2002. The advertised sale differed markedly from the modified Alternative 2 that was confirmed with the rejection of Plaintiffs' administrative appeal. The sale prospectus informed prospective bidders that the sale would be about 9.5 mmbf over about 800 acres. The board feet to be cut tripled and the acreage was reduced by nearly eighty per cent. The Forest Service released a Supplemental Information Report on June 11, 2002 in which it concluded that the change from the original EA was not significant.

The sale was let for bid on June 12, 2002. On June 17, 2002 Forest Supervisor Bernhardt determined that the sale design changes included in the SIR were not significant and no correction, supplement, or revision of the EA was necessary. Three Rivers Timber, the lone bidder on the sale, was awarded the timber sale contract on June 21, 2002.

Plaintiffs filed suit over the Burnt Flats salvage project on June 24, 2002, and requested a Temporary Restraining Order and Preliminary Injunction on July 2, 2002. Counsel for the government stipulated to a Temporary Restraining Order to be in effect until July 15, 2002.

At oral argument, parties stipulated to an extension of the Temporary Restraining Order until July 26, 2002. In its Order of July 26, 2002, the Court denied Plaintiffs' Motion for Preliminary Injunction. Logging is now proceeding at the site. This case epitomizes the conflict between meaningful participation in public decisions about land use and deference to agency expertise.

## II. Analysis

### A. Preliminary Injunction

"To obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor." *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 523 (9th Cir.1984); *See also Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200–01 (9th Cir.1980). These two formulations create a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *Coliseum*, 634 F.2d at 1201. Plaintiffs must also show a significant threat of irreparable injury. *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984). The purpose of a preliminary injunction is to preserve the status quo. *Coliseum*, 634 F.2d at 1200.

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir.1984). Purely monetary injuries are not normally considered irreparable. *Coliseum*, 634 F.2d at 1202.

### B. The Supplemental Information Report

Plaintiffs argue that the increase from about 3 mmbf to 9.5 mmbf is a "significant new circumstance[ ] or information relevant to environmental concerns and bearing on the proposed action or its impacts," and obligates the Forest Service to supplement the existing EA pursuant to 40 C.F.R. § 1508.9(c)(1)(ii). The Forest Service responds that it took the requisite hard look at the proposed changes in volume and acreage and determined that the change was not significant and did not significantly affect the analyses or conclusion in the EA. The Forest Service determined that a supplemental EA was not

warranted here because it determined that the effects of the project still remain within the scope and scale of the effects described in the EA.

 NEPA imposes on federal agencies a continuing duty to supplement EAs and EISs in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). "NEPA requires that federal agencies take a 'hard look' at the environmental effects of their planned action and should apply a 'rule of reason' as to whether a supplemental EA is required." *Greater Gila Biodiversity Project v. United States Forest Service*, 926 F.Supp. 914, 916–17 (D.Ariz.1994)(citing *Marsh*, 490 U.S. at 374, 109 S.Ct. 1851). The "rule of reason turns on the value of the new information to the still pending decision making process." *Id.* (quoting *Marsh*, 490 U.S. at 374, 109 S.Ct. 1851). "The Forest Service's decision to forego an SEIS should not be set aside unless it was arbitrary or capricious." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir.2000). *See also Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1152 (9th Cir.1998) (holding that the standard for supplementing an EA is the same as for an EIS).

 The Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Friends of the Clearwater*, 222 F.3d at 559 (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). "Review under this standard is to be searching and careful, but remains narrow, and a court is not to substitute its judgment for that of the agency. This is especially appropriate where, as here, the challenged decision implicates substantial agency ex-

pertise." *Id.* (quoting *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993)). Plaintiffs here have the burden of showing that there is not "a rational connection between the facts found and the choice made" or that there was a clear error in judgment based on the relevant factors. *Wilderness Society v. Bosworth*, 118 F.Supp.2d 1082, 1088 (D.Mont.2000) (citing *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The agency decision is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before the agency." *Id.*

 Supplemental Information Reports are not mentioned in NEPA or in the regulations implementing NEPA. *See Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 565–66 (9th Cir.2000). Courts have nonetheless recognized a limited role within NEPA's procedural framework for SIRs and other "non-NEPA" environmental evaluation procedures "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Id.* at 566. "[O]nce an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Id.* In other words, the agency is required to follow the rules in its decision making. It is not at liberty to make up new rules during the review process. It is not at liberty to change the process as the evaluation is going on. Plain and simple, the agency needs to follow the right procedure when it makes its decisions.

 The Forest Service may use a SIR to analyze the significance of informa-

tion that is "truly new," but may not use a SIR for information that it "knew or should have known" at the time it prepared the original EA. *Id.* at 567. It is "inconsistent with NEPA for an agency to use an SIR, rather than a supplemental EA or EIS," to add information it knew or should have known. *Id.* Environmental consideration documents must be "prepared early enough so that [they] can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Id.* (citations omitted).

■ At oral argument on July 11, 2002, Plaintiffs argued that the SIR was improper here because the Forest Service knew the final design of the sale would be 9.5 mmbf on 800 acres as early as January 2002 and it should have included this information in the EA. The Forest Service released the Burnt Flats EA in August of 2001. The Biological Assessments for sensitive, threatened, or endangered plants and terrestrial animals released on October 20, 2001 did not take into account the plan to cut 9.5 mmbf from 800 acres. The Fish and Wildlife Service issued its concurrence based on the Alternative 2 figures of 3 mmbf over 3,340 acres. Results of timber cruising and development of cutting units that incorporated the plan to log 9.5 mmbf over 800 acres were in place by October 2, 2001. The brush disposal plan dated December 6, 2002 was based on the plan to cut 9.5 mmbf from 800 acres that was revealed in the SIR. The Biological Assessment for fish species, dated January 9, 2002, also is based on 9.5 mmbf from 800 acres. It cites the basis for these logging figures as Alternative 2 of the EA. The National Marine Fisheries Service issued its concurrence based on these cutting plans. Thus the Forest Service was aware that the sale would be 9.5 mmbf over 800

acres as early as September 2001, yet it proceeded publicly as if the alternatives in the EA were still in consideration. The public documents were diametrically opposed to what was going on inside the project operation and planning. Forest Supervisor Bernhardt signed the Decision Notice on February 12, 2002 adopting Alternative 2 of the EA. Public comments on the EA were in response to plans to cut 3 mmbf over 3,340 acres. In short, what seems to have happened here is the Forest Service was saying one thing while doing another. The troubling question is, "Why"?

A factor that sets this case apart from *Alexander* is that the Forest Service analyzed many of the effects of the project as a 9.5 mmbf over 800 acre sale, and not as a 3 mmbf over 3,340 acre sale. In *Alexander*, the Forest Service used SIRs not to analyze the significance of new information or changed circumstances, but to present information and analysis that it knew was required, but had failed, to include in its original NEPA documents. *Alexander*, 222 F.3d at 566–67. Most of the information and assessments in the SIR in this case was not new; the Forest Service based its analyses and planning on the information ultimately put forth in the bid call for at least nine months before the SIR was released. The logical inferences drawn from the record show that Forest Service employees operated on the assumption that 9.5 mmbf over 800 acres was Alternative 2 of the EA and completed their analyses accordingly. Why would the Forest Service privately act on one set of data while simultaneously representing to the public and a sister agency that a different set of data formed the basis of the decision-making process? The question in this case is whether this tactic runs afoul of NEPA's requirements. The frustration with this legal conundrum is knowing that if the procedural rules are

followed the agency is entitled to great deference in its decision making. If the agency does not follow the requirements of law procedurally, then its substantive decision-making is jeopardized.

NEPA is a procedural statute, and the Ninth Circuit has held that "agency action taken without observance of the procedure required by law will be set aside." *Id.* at 567. (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir.2000) (quoting *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir.1988))). "[I]f the Forest Service were permitted to correct deficiencies in an EA or an EIS by means of an SIR or another non-NEPA procedure, the regulations governing the supplementation of NEPA documents promulgated by the CEQ, as well as the Forest Service's own rules on the issue, would be superfluous." *Id.* at 567. I am bound to follow the law of this circuit.

Recognizing that it had completed so much of the Burnt Area project's analysis as if the 9.5 mmbf alternative really were Alternative 2 of the EA, it is not surprising that the Forest Service determined that the change from 3 mmbf to 9.5 mmbf was not significant. The Forest Service had privately analyzed and decided what to do on information that it apparently did not share with the public or all other agencies.

The legal problem here is that NEPA requires agencies to disclose their project plans to the public and allow the public to offer comments and feedback on the agencies' proposals. Public comment about unreliable data is as meaningless as sister agency concurrence in the impact of careless facts. Here Plaintiffs never had the opportunity to review the 9.5 mmbf plan. This is true even though the Forest Service obviously intended to offer this as the chosen alternative. The record shows this intent well before the agency adopted the 3.5 mmbf alternative from the EA. Now if

the project area is smaller, even though the amount of timber to be cut is increased threefold, the question is, "So what"? The harm to Plaintiffs is in the denial of the right to participate. It is procedural. It also keeps them from making meaningful substantive comments on the EA. The bait-and-switch tactic the Forest Service employed defeats the purpose and intent of NEPA to allow the public opportunity to participate in the decision-making process.

If the information in the SIR is new, the Forest Service's method would pass muster. In the SIR, the Forest Service determined that changing the project from 3 mmbf to 9.5 mmbf was not a significant change. I think the agency took the necessary hard look that would require deference to its judgment if it had only followed the requirements of the law! Because it determined that the change was not significant, the agency would not be required to supplement its EA. *See Alexander*, 222 F.3d at 566. The SIR in this case takes a hard look at the environmental consequences of the planned changes. It considered the relevant factors and displayed no clear error in judgment. *See Friends of the Clearwater*, 222 F.3d at 559.

Plaintiffs allege here that the Forest Service has violated NEPA by failing to address the impacts of enlarging the sale to 9.5 mmbf; by failing to address scientific reports and recommendations that are contrary to the findings of the Forest Service here; by failing to ensure viability of certain wildlife species; and by failing to analyze mitigation measures properly. Plaintiffs claim that the Forest Service should complete a full-blown EIS here, and that the project violates Nez Perce Forest Plan standards on management indicator species, old-growth standards, and soil standards. Plaintiffs also challenge the monitoring methodology used by the Forest Service that has been upheld by the

Ninth Circuit, but has subsequently been ruled insufficient by courts in other circuits. *Inland Empire Public Lands Council v. United States Forest Service*, 88 F.3d 754, 761–63 (9th Cir.1996). *Cf. Forest Guardians v. United States Forest Service*, 180 F.Supp.2d 1273 (D.N.M.2001); *Utah Environmental Congress v. Zieroth*, 190 F.Supp.2d 1265 (D.Utah 2002). What Plaintiffs want is to have a Ninth Circuit panel review *Inland Empire* to determine if it should reconsider en banc and join in the conclusion of other courts that have considered the issue since the Ninth Circuit's decision in *Inland Empire*. Each of Plaintiffs' allegations is based on an EA that, for all practical purposes, is largely inapplicable to the real planned sale.

Plaintiffs have not been afforded the opportunity required to participate meaningfully in the statutorily-required public process. The Forest Service has prepared a sale that, if the public had been afforded proper opportunity to be involved, would seem to pass judicial muster. But this is uncertain because it is impossible to know what Plaintiffs and other participants in the public process would have added to the record here.

## C. Balance of Hardships

■ The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Alexander*, 222 F.3d at 568 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). "Consequently, when environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Id.* (quoting *Sierra Club v. United States Forest Service*, 843 F.2d 1190, 1195 (9th Cir.1988) (quoting *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396)).

Logging has begun on this project. The trees slated to be logged here are in danger of losing substantial economic value with the passage of time. Owners and employees of the logging company that bought the timber sale here have been subjected to the caprices of the agency's circumvention of the public process no less than Plaintiffs. The Forest Service has had ample opportunity to update the public process for this project, yet failed to do so. Rather the agency proceeded on two parallel tracks, one for public consumption, and another for its own planning.

Plaintiffs prevail here on their legal procedural claim, yet I have serious doubts that Plaintiffs will prevail on their substantive claims. Consequently I will grant Plaintiffs a modified injunction limited to procedural matters. In order to expedite the process, I will immediately remand this matter to the Forest Service to allow the agency to supplement the EA as necessary and comply with the requirements of NEPA. However the injunction does not extend to the logging. During the pendency of the summary judgment motions the Forest Service may modify the EA and logging may continue.

Wherefore IT IS HEREBY ORDERED that:

1. The Court's Order of July 26, 2002 is WITHDRAWN.

2. Plaintiff's Motion for a Preliminary Injunction is GRANTED in part and DENIED in part as delineated above.

3. This matter is remanded back to the Forest Service to re-open the administrative process on the Burnt Area Project under its regulations to allow

Plaintiffs full opportunity to develop the administrative record.